A

File: JanSport

# License Agreement for Backpack and Waist Pack Cushions Made from Gelastic™ GellyComb™

This License Agreement ("Agreement") is entered into this 9 day of December, 1998 and is by and between the following Parties:

**LICENSOR:** TekSource, LC
a Utah limited liability company
12577 South 265 West, Bldg. 3A
Draper, Utah 84020

**LICENSEE:** JanSport
a ____________________________
N850 County Highway CB
Appleton, WI 54913

**Recitals**

WHEREAS, Licensor is the owner of certain Technology Rights and Trademark Rights (as defined in Paragraphs 1.1 and 1.2 below);

WHEREAS, Licensee wishes to obtain a license of the Technology Rights and the Trademark Rights on the terms and conditions set forth herein;

WHEREAS, Licensor desires to grant a license of the Technology Rights and the Trademark Rights to Licensee only on the terms and conditions set forth herein;

NOW, THEREFORE, the Parties agree as follows:

## SECTION 1. - DEFINITIONS

1.1 Technology Rights. The following terms shall each have their respective defined meanings:

(a) Gelastic. The term "Gelastic" shall mean technology related to a particular elastomer gel owned by Licensor, including the gel itself, formulations for making the gel, methods for making the gel, products made from the gel and methods for making products from the gel as defined by the patent applications identified as Gelastic Patent Applications in Exhibit A hereto. Gelastic shall not be construed to mean "Goooz", for which different patent applications were filed, and which is a slow-rebound elastomer.

(b) Gellycomb. The term "Gellycomb" shall mean technology related to a cushioning structure owned by Licensor and made from elastomeric or visco-elastomeric materials and having hollow buckling columns, including cushioning devices which incorporate the structure, column structure patterns, products which incorporate the structure, and methods for making products which incorporate the structure as defined by the patents identified as Gellycomb Patent applications in Exhibit A hereto.

(c) Trade Secrets. The Parties specifically acknowledge that Gelastic and Gellycomb are held by and are protected by Licensor as trade secrets as defined in Utah Code Annotated § 13-24-1 *et seq.* The subject matter so held by Licensor is referred to herein as the "Trade Secrets."

 [initials] 12/9 [initials] 12/9

(d) Know-How. "Know-How" shall mean information related to manufacturing, production and commercialization of Gelastic and Gellycomb.

(e) United States Patent Rights. "United States Patent Rights" shall mean one or more United States patent applications which Licensor has filed or may file in its efforts to secure United States patent protection for Gelastic and Gellycomb and any and all issued patents, reissue patents, reexamined patents and corrected patents based on any of them.

(f) Foreign Patent Rights. "Foreign Patent Rights" shall mean any and all foreign national patent applications which Licensor may file in its efforts to secure foreign patent protection for Gelastic or Gellycomb, and any and all issued patents, reissue patents, reexamined patents and corrected patents based on any of them.

(g) Patent Rights. "Patent Rights" shall mean United States Patent Rights and Foreign Patent Rights collectively.

(h) Technology Rights. "Technology Rights" shall mean Gelastic, Gellycomb, the Trade Secrets, Know-How and Patent Rights, collectively.

1.2 Trademark Rights. "Trademark Rights" shall mean all U.S. common law, federal and state trademark and service mark rights and all foreign trademark and service mark rights to the marks "GELASTIC" and "GELLYCOMB" and all variations of them which may be used to designate the source or origin of Gelastic products and services or Gellycomb products or services.

1.3 Information. During the performance of the terms of this Agreement, Licensee will learn highly sensitive, proprietary information owned by Licensor. The information may include inventions, trade secrets, information concerning or relating to Gelastic or Gellycomb, designs, patent applications, formulas, processes, recipes, equipment, prototypes, models, mock-ups, samples, materials, manufacturing methods, business plans, marketing information, customer lists, forecasts and the like ("Information").

1.4 Confidential Information and Confidential Materials. "Confidential Information" means any and all Information disclosed by Licensor to Licensee. "Confidential Materials" means any tangible medium (paper, film, magnetic media, actual models, mock-ups, materials, samples, prototypes, etc.) containing or fabricated using Confidential Information. Confidential Information shall not include any information which (i) was in the public domain prior to the execution of this Agreement, or (ii) was already known by the Receiving Party, provided that this Paragraph 1.4(ii) is only applicable if within ten (10) days of disclosure of any Confidential Information of which the Receiving Party claims prior knowledge, the Receiving Party both notifies the providing Party in writing of such prior knowledge and provides the providing Party with documentary evidence showing such prior knowledge.

1.5 Geographic Region. The term "Geographic Region" shall mean worldwide.

1.6 Licensed Field of Use. "Licensed Field of Use" shall mean backpacks and waist packs and any cushioning for backpacks and waist packs to supplemental and replacement straps for these products. Backpacks meaning packs intended to be worn on a persons back with multiple straps. Waist packs meaning packs intended to be carried by a waist belt.

1.7 Excluded Fields of Use. The Licensed Field of Use specifically excludes, and this exclusion is not limited to, the following "Excluded Fields of Use": Luggage, briefcases, gym/sport bags, golf bags, baby carriers, medical bags, computer cases, carrying cases, any bags/cases designed to be carried by only one shoulder strap (even if the user has more than one strap from which to choose) or by a handle, and attachable/removable after-market straps for all fields of use.

1.8     Reserved Fields of Use. "Reserved Fields of Use" shall mean all fields of use expressly cited in the Excluded Fields of Use and all fields not expressly recited in the Licensed Field of Use.

1.9     Licensed Product. "Licensed Product" shall mean any product with components which embody or are made using Gelastic or Gellycomb and which subsists within the Licensed Field of Use.

1.10    Customer. "Customer" shall be any third party to whom Licensee sells or otherwise transfers Licensed Product for consideration.

## SECTION 2. - THE LICENSES

2.1     Technology License. Subject to and on the terms and conditions contained herein, especially but not limited to the Reserved Technology License of Paragraph 2.2 below, Licensor hereby grants to Licensee, and Licensee hereby accepts, an exclusive license of the Technology Rights to make, use, and sell Licensed Products in the Geographic Region. This license is referred to in this Agreement as the "Technology License." To the extent that the Technology License terminates or is terminated for a particular market, jurisdiction or country under this Agreement, Licensee agrees not to make, use or sell any Licensed Product in such country or region in which the License terminates or is terminated, and Licensor shall be permitted to market and sell or license the Technology Rights, and to manufacture, market and sell products using the Technology Rights to third parties in such country or region.

2.2     Reserved Technology License. Licensor reserves for itself the right to make and use Licensed Product for the purposes of Licensor's further testing and development of Gelastic and Gellycomb. Licensor also reserves for itself the right to engage in any activities whatsoever with respect to Gelastic and Gellycomb in the Reserved Fields of Use. This is collectively referred to in this Agreement as the "Reserved Technology License." Notwithstanding the Reserved Technology License, Licensor shall have no obligation to further test, develop or improve Gelastic or Gellycomb.

2.3     Trademark License. Subject to and on the terms and conditions contained herein, especially but not limited to the Reserved Trademark License of Paragraph 2.4 below, Licensor hereby grants to Licensee, and Licensee hereby accepts, a non-exclusive license of the Trademark Rights for the limited purpose of designating the source or origin of Licensed Products and services performed using Licensed Products. This is referred to in this Agreement as the "Trademark License." Licensee shall place the words "GELASTIC™" and "GELLYCOMB" in an appropriate manner on each Licensed Product or its packaging in a visible location and in a visible font.

2.4     Reserved Trademark License. Licensor reserves for itself the right to exploit the Trademark Rights in any manner that is not in direct conflict with the Trademark License.

2.5     The License. As used herein, "License" shall mean the Technology License and the Trademark License collectively.

2.6     No Sublicense without Consent. Licensor has specifically chosen Licensee to commercialize Gelastic and Gellycomb in the Field of Use because of Licensor's belief in Licensee's technical abilities, managerial efficiency, marketing expertise and high standards of business ethics. Accordingly, Licensee shall not, and Licensee has neither the right nor the power to, grant any sublicense under the License to any third party with the exception of wholly owned subsidiaries of Licensee without the advance written consent of Licensor. No party other than Licensee and its affiliate companies, VF Europe, VF Asia, and VF Latin America have the right to exploit the License or any portion thereof.

2.7     Reservations. Rights not expressly granted to Licensee under this Agreement or the License



are reserved by Licensor. No part of this Agreement shall be interpreted to prevent Licensor from engaging in any activities that do not directly conflict with any obligation of Licensor under this Agreement.

## SECTION 3 - TECHNOLOGY RIGHTS AND CONSULTATION

3.1 Gelastic and Gellycomb Formulations and Processes. Not later than ten (10) business days after Licensee's payment of the License Issue Fee (defined in Paragraph 4.1 below) to Licensor, Licensor shall provide Licensee with the formulations of Gelastic and the manufacturing processes for Gelastic and Gellycomb which Licensor believes to be best suited for the Licensed Products. From time to time, at Licensor's own initiative or at Licensee's request, Licensor may provide Licensee with updates concerning Gelastic and Gellycomb formulations and manufacturing processes for Gelastic and Gellycomb to the extent the Gelastic and Gellycomb formulations or processes have been improved. Licensee shall only use Gelastic formulations provided or approved by Licensor.

3.2 Questions and Consultation. Licensee may contact Licensor from time to time with questions about Gelastic or Gellycomb and Licensor shall attempt to answer those questions. However, if Licensee wishes for Licensor to engage in any research, development, testing or evaluation work concerning Gelastic or Gellycomb, Licensee may propose a project to Licensor and Licensor shall respond to Licensee's proposal in a timely manner.

## SECTION 4 - CONSIDERATION

4.1 License Issue Fee. In consideration for grant of the License, Licensee shall pay to Licensor a License Issue Fee of two hundred thousand dollars (U.S. $200,000.00), payable by business check upon signing, sent by Federal Express overnight service, Air Bill number to be supplied to Licensor. The entire License Issue Fee shall be deemed earned when paid. The License shall only take effect upon Licensor's timely receipt of the License Issue Fee.

4.2 Royalty. In addition to the License Issue Fee, Licensee shall pay to Licensor a "Royalty" equal to twenty five cents (U.S. $0.25) for each Licensed Product sold or otherwise transferred for consideration or used during the Term of the License. The royalty is per pack, not per pad within the pack. Example 1: A backpack sold containing two Gellycomb scapula pads and two Gellycomb shoulder pads will result in payment of royalty of twenty five cents (U.S. $0.25). Example 2: A fanny pack sold containing a single Gellycomb pad will result in payment of royalty of twenty five cents (U.S. $0.25). The Royalty shall be in addition to the License Issue Fee. The triggering event for the payment of the Royalty shall be the earliest of shipment of a Licensed Product by Licensee, the performance of a service using a Licensed Product, preparation of an invoice related to a Licensed Product or an associated service, or use or transfer of a Licensed Product. After the occurrence of a triggering event, the Royalty shall become due regardless of Licensee's receiving payment from its Customer.

4.3 Royalty Reduction. The License includes a complete package of potentially valuable technical information and legal rights for which Licensee is ready, willing and able to pay the License Issue Fee, the Royalty, and other payments and consideration due under this Agreement. Licensee and Licensor acknowledge that Licensor has applied for patent protection for Gelastic and Gellycomb, and may pursue additional patent protection for Gelastic and Gellycomb, and that patent protection might benefit Licensee. Licensee and Licensor have considered, however, that at some point in time, there may cease to be patent claims or pending patents anywhere in the world that cover Gelastic or Gellycomb or any portion of any of them. In that event, Licensor and Licensee agree that a Royalty should still be payable for the Technology Rights, but that a reduction in Royalty shall be appropriate to reflect the lack of such patent claims, pending patents, or patent protection. Accordingly, the Royalty shall be reduced to twenty cents (U.S. $0.20) per Licensed product during any calendar quarter in which no patent claim or pending patent covers Gelastic or



Gellycomb or any portion of them for the entire calendar quarter.

4.4 Grant Back License of Improvements. In further consideration for the License, Licensee agrees to grant a non-exclusive license (the "Grant Back License") to Licensor of all improvements, modifications, extensions and applications of the Technology Rights and any portion thereof conceived, owned or licensed by Licensee, its successors, assigns, employees and contractors, etc. during the Term of this Agreement. The Grant Back License shall cover all fields of use. Licensee shall promptly disclose to Licensor all improvements, modifications, extensions and applications of the Technology Rights both orally and in writing. GrantBack License shall remain in effect as long as this Agreement remains in effect.

4.5 Payments. All references in this Agreement to dollars or $ shall mean dollars of the United States of America. All payments to Licensor shall be made in United States dollars. Licensee shall pay Licensor all Royalties due hereunder on a quarterly basis. The Royalty payment for a given calendar quarter shall be made within thirty (30) days of the end of the calendar quarter in which the Royalty accrued. All payments due under this Agreement shall be paid by check to Licensor at the address shown on page 1 of this Agreement, or to any other person or entity which Licensor may designate to receive payments.

4.6 Reports. Within thirty (30) days following the end of each quarter, Licensee shall provide Licensor with a written report showing sales in such quarter and the amount of Royalty payable with respect thereto. Such reports shall include the following information: (a) the number of units of each type of Licensed Product sold, rented or leased, (b) Net Sales from (a), and (c) Royalty payable. A report of the type required under this Paragraph shall accompany each Royalty payment submitted to Licensor, or shall be sent without a Royalty payment if no Royalty payment is due for the quarter. Within thirty (30) days following the end of each calendar year, Licensee shall provide Licensor with a written, good faith forecast of Net Sales for the next five years. Such forecasts shall merely be best projections of future sales and are not binding.

4.7 Overdue Payments. In the event Licensee fails to pay any amount when due hereunder, such amount shall bear interest at the rate of eighteen percent (18%) annually, compounded monthly, until the date when such amount is paid in full. No interest shall be due if payment is received within ten (10) days of due date, was mailed in the United States of America, and bears an official post mark of not less than five (5) days prior to the due date.

4.8 Non-Refundability of Payments. All payments made to Licensor by Licensee under this Agreement are made in consideration of Licensor disclosing potentially valuable Trade Secrets to Licensee, providing Licensee with a potential competitive advantage in the marketplace, granting the Technology License and the Trademark License, Licensee's efforts to date in securing patent protection that may benefit Licensee and otherwise potentially enhancing Licensee's competitive position through performance of this Agreement. Accordingly, the Parties deem all payments made hereunder to be earned when paid and to be completely non-refundable.

## SECTION 5 - LICENSEE PERFORMANCE CRITERIA

5.1 Minimum Royalty Payments. Licensor has elected to grant Licensee an exclusive License because of Licensor's belief in Licensee's ability to successfully commercialize Gelastic and Gellycomb in the Licensed Field of Use. In order to ensure Licensor that Licensee's commercialization of Gelastic and Gellycomb will be successful and that certain minimum royalty payments will be made by Licensee to Licensor, Licensee and Licensor have agreed upon a schedule of minimum royalty payments. As detailed in Paragraph 5.4, it is the intention of Licensor and Licensee that the Technology License only remain in force if Licensee makes minimum royalty payments in accordance with the schedule shown in Paragraph 5.2 below.

 12/9 TB 2/9

5.2 Minimum Royalty. An annual "Minimum Royalty" shall become payable quarterly by Licensee to Licensor. In the event that cumulative actual Royalties paid during a calendar year in any calendar quarter are less than the minimum cumulative amount for that quarter set forth below, Licensee shall pay the deficiency necessary to reach such cumulative Minimum Royalty.

| *Calendar Year* | *Cumulative Minimum Royalty 1st Quarter* | *Cumulative Minimum Royalty 2nd Quarter* | *Cumulative Minimum Royalty 3rd Quarter* | *Cumulative Minimum Royalty Annual Royalty* |
|---|---|---|---|---|
| April-December, 1999 | $0 | $6,000 | $12,000 | $18,000 |
| 2000 | $15,000 | $30,000 | $45,000 | $60,000 |
| 2001 | $20,000 | $40,000 | $60,000 | $80,000 |
| 2002 | $25,000 | $50,000 | $75,000 | $100,000 |
| 2003 | $30,000 | $60,000 | $90,000 | $120,000 |
| 2004 and each year thereafter | $35,000 | $70,000 | $105,000 | $140,000 |

5.3 Royalty Payments in Excess of Minimum Royalty. No Royalties paid, whether above, below, or equal to the Minimum Royalty, are to be considered an advance or credit against any Royalty (whether the Minimum Royalty or otherwise) which is due at any future date.

5.4 Failure to Make Minimum Royalty Payments. For any given calendar quarter, if Licensee does not either (i) pay the appropriate Royalty to Licensor (as defined in Paragraph 4.2 above), or (ii) in the event that the Royalty for a given calendar quarter does not equal or exceed the Minimum Royalty for that quarter as set forth in Paragraph 5.2, pay the Minimum Royalty payment to Licensor for that calendar quarter, then Licensor may, in Licensor's sole discretion, terminate the License for the entire Geographic Region or any part thereof by providing written notice of termination to Licensee. Licensor shall then be free to seek another licensee (or licensees) of the Technology Rights or otherwise use or dispose of the Technology Rights in such regions as Licensor sees fit.

## SECTION 6 - DELETED

## SECTION 7 - CONFIDENTIALITY

7.1 Protection. Licensee shall not disclose, transfer or offer to disclose or transfer any Confidential Information or Confidential Materials to any other person or entity, including without limitation any of Licensee's employees who do not have a legitimate need to know any Confidential Information or utilize any Confidential Materials. Licensee may only disclose, transfer, or offer to disclose or transfer any Confidential Information or Confidential Materials to those of its employees with a legitimate need to know any Confidential Information or utilize any Confidential Materials, and then only to those employees who are bound by the confidentiality terms of this Agreement. Licensee shall not use Confidential Information except for the purpose described in Paragraph 7.2. Licensee shall take all reasonable precautions to ensure against any disclosure, transfer or use of Confidential Information or Confidential Materials not specifically authorized by Licensor in writing. In the event that Licensee desires to use a subcontractor for manufacturing Licensed Products, that subcontractor must be approved by Licensor, which approval shall not unreasonably be withheld, and that subcontractor must sign a confidentiality agreement with Licensee and a separate confidentiality agreement with Licensor separately (form attached as Exhibit B), which agreements must fulfill the intents of this Section 7.

 12/9 12/9

7.2 Purpose. Licensee may only use the Confidential Information and Confidential Materials for the purpose of commercially exploiting the License within the terms and conditions set forth in this Agreement.

7.3 Exception. To the extent that Confidential Information or a portion thereof becomes part of the public domain after the execution of this Agreement, and through no fault or action of Licensee, then as of the date that such Confidential Information becomes part of the public domain, this Section 7 shall prospectively cease to cover such Confidential Information, although this Section 7 shall remain enforceable prospectively with respect to any Confidential Information which has not entered the public domain and this Section 7 shall remain enforceable retrospectively with respect to any Confidential Information that was covered by it on any prior date.

7.4 Disclosure Concerning Existence of this Agreement. The Parties shall be permitted to disclose the existence of this Agreement and the general nature of the terms of this Agreement or otherwise as required by Law. Particularly, but not by way of limitation, the Licensed Field of Use may be disclosed by Licensor to other prospective licensees of the Technology Rights so as to ensure complete understanding by the prospective licensee of fields of use that remain available for license.

**SECTION 8 - OWNERSHIP, RESPONSIBILITY ETC.**

8.1 Ownership. Nothing in this Agreement assigns or transfers to Licensee ownership of the Technology Rights, the Trademark Rights or any portion thereof. Licensor shall hold title to, and be the owner of, the Technology Rights and the Trademark Rights, and Licensee shall be an exclusive licensee of the Technology Rights in the Licensed Field of Use and a non-exclusive licensee of the Trademark Rights per the provisions of this Agreement. Licensee shall not patent or attempt to patent Gelastic or Gellycomb or any variation, modification or improvement thereof, without prior written permission from Licensor.

8.2 Responsibility for Patents, Trademarks, Etc. Licensor shall solely control and make all decisions relating to the filing, prosecution, issuance, maintenance, abandonment, defense, etc. of all aspects of the Technology Rights and the Trademark Rights. Notwithstanding the foregoing, Licensor shall duly consider any and all input provided by Licensee concerning the Technology Rights and the Trademark Rights. Any intellectual property work done by Licensor at the specific request of Licensee shall be billed to Licensee at Licensor's Standard Rates for R&D Services, and Licensor shall periodically provide Licensee with statements showing the amount owed by Licensee under this Paragraph, and Licensee shall provide Licensor with a check for reimbursement within thirty (30) days of receiving any statement. The foregoing sentence does not apply to intellectual property work done at the discretion of Licensor, which is addressed in paragraph 8.3 below.

8.3 Payment for Patent and Trademark Prosecution and Maintenance Costs. In its efforts to secure and maintain patent and trademark protection which may provide benefit to Licensee under the License, Licensor will incur attorneys' fees (as a result of use of both in-house and outside counsel) and Licensor will incur various out-of-pocket costs (such as patent office fees, draftsman charges, etc.). Licensee shall reimburse Licensor for 1/n X 100% of such costs where "n" is equal to the total number of licensees of the Technology Rights and the Trademark Rights at the time of the expense. For example, if there are 20 such licensees for Gellycomb, Licensee shall reimburse Licensor for five percent (5%) of such attorneys' fees and out-of-pocket costs. In the event that "n" is less than five (5), five (5) shall be used in place of "n", indicating that in no case shall Licensee pay more than twenty percent (20%) of these costs. In no case shall Licensor be required to pay for more than $10,000 in such fees and expenses in any one calendar year to fulfill the obligations of this paragraph 8.3. Licensor shall periodically provide Licensee with statements showing the amount owed by Licensee under this Paragraph, and Licensee shall provide Licensor with a check for reimbursement within thirty (30) days of receiving any statement.

 12/9 12/9

8.4 Infringement Enforcement and Defense of Patent Rights. If Licensee learns of any activity that may constitute infringement of or threat to any of the Technology Rights or the Trademark Rights, Licensee shall promptly inform Licensor of the facts surrounding such suspected infringement or threat. The Parties recognize that it may be in the best interests of both Parties to cooperate in any settlement discussions and lawsuits, and the Parties agree to negotiate in good faith concerning such cooperation within thirty (30) days of Licensee's notification to Licensor of such infringement. The negotiation shall include such items as the sharing of costs and the sharing of awards or settlement payments. If neither party wishes to pursue the matter, neither is obligated. If only one party wishes to pursue the matter, that party may pursue the matter alone at its own expense as it sees fit, and that party will receive all proceeds from the actions taken.

8.5 Cooperation. In any proceeding concerning procurement, enforcement or defense of the Technology Rights or the Trademark Rights, or any portion thereof, the Parties shall cooperate with and assist each other in such proceeding including making witnesses available to testify in person and by affidavit, making documents available and otherwise providing reasonable cooperation. This Paragraph shall not be construed as requiring either Party to make any statement or representation that the Party believes to be inaccurate, false or incomplete. In the event that such cooperation becomes material in cost to the cooperating party, the requesting party shall reimburse such costs, including lost time.

8.6 Patent Marking. To the extent that Licensor secures any patents for Gelastic or Gellycomb, Licensor shall inform Licensee of appropriate patent marking to be placed on Licensed Products and their packaging, and Licensee shall utilize such marking. Even without such notification, Licensor shall appropriately mark the Licensed Products or their packaging with the current Gellycomb patent and the notification "other US and international patents pending", which is the current status, until such status changes.

8.7 Quality Control. Licensee agrees to use the appropriate trademarks legibly in all advertising, literature, and packaging associated with Licensed Products. Any reference to the licensed gel materials must use the term Gelastic, as appropriate, and any reference to the licensed hollow-column materials must use the term Gellycomb, as appropriate, and in neither case may use another mark or name of Licensee's choosing, and must indicate that the Gelastic or Gellycomb trademark belongs to TekSource, LC of Draper, Utah (or wherever TekSource or its successor resides at the time). In order for Licensor to maintain its Trademark Rights, it is necessary for Licensor to monitor the quality of Licensed Products to ensure that they conform to the quality of goods that Gelastic and/or Gellycomb are used to identify. Accordingly, and for any and all other purposes of Licensee, for each SKU number (or equivalent) that Licensee establishes for Licensed Products, Licensee shall provide Licensor with at least three (3) products free of charge on a yearly basis. Licensor may then review the quality of those Licensed Products and provide any input to Licensee regarding quality control as may be appropriate. Licensee shall take such input into consideration and shall make good faith efforts to remedy quality control problems identified by Licensor. Licensor shall then be free to use all of the Licensed Products provided pursuant to this Paragraph as it sees fit, except Licensor shall not sell or rent such Licensed Products in the Field of Use.

## SECTION 9 - RECORD KEEPING AND AUDITS

9.1 Record Keeping. Licensee shall keep detailed and complete records of all Licensed Products manufactured; to whom such Licensed Products were sold, rented, leased or otherwise delivered (including quantities, price, date and location of sale, rental, lease or delivery); inventories of Licensed Products ready for sale; and services performed using Licensed Products. Licensee shall keep paper copies of all such records, including all underlying documentation, which shall include but is not limited to purchase orders and invoices for a minimum of three (3) years from the date of creation of a particular record.

 [initials] [initials]

9.2 Examinations and Audits. Licensor shall have the right to audit and investigate once each calendar year during normal business hours, at Licensor's expense, the books, accounts, audits, and other things and matters showing or reflecting all business conducted by Licensee pertaining to the manufacture, sales or distribution of the Licensed Products under this Agreement. In the event that an audit of Licensee's books and records reveals that Licensee's Royalty Fees were underpaid by an amount equal to five percent (5%) or more in any year, Licensee shall bear Licensor's reasonable costs of said audit. Licensee shall provide Licensor annually with unaudited financial statements of Licensee as soon as possible, and in any event within ninety (90) days, after the close of Licensee's fiscal year.

SECTION 10 - INSURANCE

10.1 Insurance. Beginning no later than the date on which Licensee sells, rents, leases, transfers or uses the first Licensed Product or performs a service using a Licensed Product and continuing during the entire period of time during which Licensee sells, rents, leases, transfers or uses Licensed Product or performs services using Licensed Products, Licensee shall acquire and maintain a standard product liability insurance policy in the amount of Two Million Dollars ($2,000,000.00) which expressly names Licensor as an additional insured.

SECTION 11 - WARRANTIES, DISCLAIMERS, ETC.

**11.1 DISCLAIMERS. LICENSOR MAKES NO WARRANTIES, EXPRESS, IMPLIED OR STATUTORY THAT ARE NOT EXPRESSLY SET FORTH IN THIS AGREEMENT WITH RESPECT TO THE TECHNOLOGY RIGHTS, THE TRADEMARK RIGHTS OR THE LICENSED PRODUCTS. LICENSOR DOES NOT WARRANT THAT THE TECHNOLOGY RIGHTS HAVE UTILITY, ARE ERROR FREE, ARE SAFE, ARE RELIABLE, THAT THEY WILL MEET LICENSEE'S REQUIREMENTS, OR THAT ANY PART OF THEM ARE PATENTABLE OR THAT THE PATENTS WILL BE VALID WHEN GRANTED OR THAT THE EXPLOITATION OF THE TECHNOLOGY RIGHTS OR THE TRADEMARK RIGHTS OR COMMERCIALIZING LICENSED PRODUCTS WILL NOT INFRINGE ANY EXISTING OR FUTURE PATENT, TRADEMARK OR OTHER LEGAL RIGHTS OF ANY OTHER PERSON OR ENTITY. ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT ARE EXPRESSLY DISCLAIMED AND EXCLUDED.**

**11.2 REPRESENTATIONS OF LICENSEE. LICENSEE REPRESENTS AND WARRANTS ONLY THAT: (A) IT HAS THE RIGHT, ABILITY AND INTENTION TO ENTER INTO THIS AGREEMENT AND PERFORM ITS OBLIGATIONS HEREUNDER, SUBJECT TO ANY LIMITATIONS ON SUCH RIGHT AND ABILITY THAT RESULT FORM 11.1 ABOVE; AND (B) IT HAS EXECUTED NO OTHER AGREEMENT IN CONFLICT WITH THIS AGREEMENT.**

**11.3 LICENSOR REPRESENTATIONS AND SOLE AND LIMITED WARRANTY. LICENSOR REPRESENTS AND WARRANTS ONLY THAT: (A) TO THE BEST OF ITS ACTUAL KNOWLEDGE, NO THIRD PARTY PATENTS OR OTHER THIRD PARTY LEGAL RIGHTS WILL BE INFRINGED BY GELASTIC, GELLYCOMB, THE LICENSED PRODUCTS OR EXPLOITATION OF THE TECHNOLOGY RIGHTS OR THE TRADEMARK RIGHTS; (B) TO THE BEST OF ITS ACTUAL KNOWLEDGE, IT IS THE SOLE OWNER OF THE**

**TECHNOLOGY RIGHTS AND THE TRADEMARK RIGHTS; AND (C) TO THE BEST OF ITS ACTUAL KNOWLEDGE, IT HAS THE RIGHT TO GRANT THE LICENSE GRANTED HEREIN.**

**11.4 LIMITATION ON LIABILITY. LICENSOR SHALL NOT BE LIABLE FOR ANY LIABILITY, CLAIM, LOSS, DAMAGE OR EXPENSE OF ANY KIND OR NATURE CAUSED DIRECTLY OR INDIRECTLY BY ANY INADEQUACY, DEFICIENCY, OR UNSUITABILITY OF THE TECHNOLOGY RIGHTS, THE TRADEMARK RIGHTS OR THE LICENSED PRODUCTS. IN NO EVENT SHALL LICENSOR BE LIABLE FOR ANY INDIRECT, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING BUT NOT LIMITED TO, LOSS OF INVESTMENT, LOSS OF ANTICIPATED PROFITS, OR OTHER ECONOMIC LOSS) EVEN IF ADVISED OF THE POSSIBILITY THEREOF.**

11.5 Indemnification - Licensee. Licensee assumes all responsibility and liability for the manufacturing, marketing, distribution, sale, rental, lease, use, performance of services, practice and commercial exploitation of the Licensed Products, and for exercise of the Technology Rights. Licensee shall fully and completely indemnify Licensor against, and hold it harmless from, any and all claims, threats of litigation, causes of action and demands relating to the Licensed Products or their manufacture, marketing, distribution, sale, rental, lease, use, practice or commercial exploitation based on any conduct of Licensee and Customers, including exploitation of the License and any breach of this Agreement by Licensee. Without limiting the generality of the foregoing, Licensee shall defend and hold Licensor harmless on account of, and shall indemnify Licensor against any and all claims, suits, demands, and causes of action of any type or kind whatsoever which may be made against Licensor by any person, firm or corporation on account of injuries to or death of persons or damage to property or loss of income occurring as a result of or in any way arising out of Licensee's or Customers' manufacture, use, rental, lease or sale or performance of a service, regardless of: (a) whether said claims are based upon the negligent production, use, distribution, or other negligence of Licensor, Licensee or a Customer; (b) whether the same are based upon any express or implied warranty by Licensor, Licensee or a Customer in connection with the production, distribution, rental, lease or use of the Licensed Products or performance of a service using Licensed Products; (c) the location of the court or other place where such claim, suit, demand or cause of action may be made or exist; or (d) whether such claim, suit, demand or cause of action is litigated, settled, arbitrated, mediated or otherwise resolved. Such indemnification shall include any judgments, damages, settlements, fines, attorney's fees, lost income, costs, interest and other expenses incurred as a result of such claims, actions, demands or threats. Licensee shall have the right to settle all claims, actions, demands or threats for which it has agreed to indemnify Licensor without the advance consent of Licensor provided that any such settlement is fully paid by Licensee, such settlement requires no action by Licensor whatsoever either in its execution or enforcement, and such settlement does not in any way restrict or limit Licensor other than Licensor's right to contest such claim, counterclaim, action or demand.

11.6 Allocation of Risk. This Agreement generally (and this Section 11 in particular) represents a mutually agreed upon allocation of risk between the Parties and the consideration given hereunder reflects such allocation of risk.

## SECTION 12 - TERM AND TERMINATION

12.1 Term. Subject to the exceptions below, the term of the License for each region of the Geographic Region in which the License is applicable shall begin on the date that Licensor receives the License Issue Fee in full from Licensee and shall continue perpetually unless terminated for any or all regions of the Geographic Region pursuant to the terms of this Agreement. The License shall not terminate before expiration of such Term except:

(a) by the mutual written consent of the Parties, or

 12/9 12/9

(b) as provided in Paragraph 12.2 below, or

(c) as provided in Paragraph 12.3 below, or

(d) if Licensee fails to timely obtain and maintain insurance as specified in Paragraph 10.1 above, or

(e) if Licensee fails to pay any moneys due under this Agreement, or

(f) if Licensee initiates or directly or indirectly participates in any proceeding or litigation which seeks a ruling of invalidity or unenforceability of the Technology Rights or any portion thereof, cancellation or limitation of the Trademark Rights or any portion thereof, or any other proceeding or adjudication concerning the Technology Rights or the Trademark Rights which Licensor considers adverse to its interests, unless such initiation or participation is pursuant to Licensor's written instructions, with the caveat that nothing in this Agreement shall be construed as prohibiting or limiting Licensee's participation in any such proceeding; the consequence of such participation which is not pursuant to Licensor's written instructions, however, shall be automatic and immediate termination of the License without any notice from Licensor being required to effect such termination, or

(g) if Licensee initiates or directly or indirectly participates in any reexamination proceeding concerning the Patent Rights or any portion thereof, including but not limited to citing prior art to any patent office in any country of the world, unless such initiation or participation is pursuant to Licensor's written instructions, with the caveat that nothing in this Agreement shall be construed as prohibiting or limiting Licensee's participation in any such proceeding; the consequence of such participation which is not pursuant to Licensee's written instructions, however, shall be automatic and immediate termination of the License without any notice from Licensor being required to effect such termination, or

(h) if Licensee attempts to grant or purports to grant a sublicense under the License or any portion thereof without first obtaining the written permission of Licensor, or attempts to grant or purports to grant an assignment under this Agreement or the License or any portion thereof without first obtaining the written permission of Licensor.

12.2  Termination at the Will of Licensee. Licensee may terminate the License for any region of or for all of Geographic Region by providing Licensor with at least six (6) months' prior written notice of termination. Termination shall be effective on the date specified by Licensee in such notice, but not sooner than six (6) months if the entire Geographic Region is terminated. If no date is specified in such notice, then termination shall be effective six (6) months following the date of such notice if the termination is for the entire Geographic Region not previously terminated and ten (10) days if the termination is for only a portion of the Geographic Region not previously terminated. If the notice does not specify which regions of the Geographic Region for which the License is being terminated, the termination shall be effective for the entire Geographic Region. Provided, however, that the Licensee may terminate the License upon 30 days prior written notice should Licensor (a) become insolvent, (b) file a voluntary petition in bankruptcy, (c) make an assignment for the benefit of creditors or otherwise enter into any scheme or composition with its creditors, (d) be adjudicated a bankrupt, (e) suffer a receiver to be appointed for the operation of its business, or (f) make a liquidation of substantially all of its assets.

12.3  Breach. If either party breaches any term of this Agreement and fails to cure such breach within thirty (30) days of receiving notice of breach from the other party, then the non-breaching party may terminate the License by providing written notice of termination to the breaching party. If either party repeats a type of breach after it has been cured (e.g., failure to make a monetary payment on time), the breach

shall be deemed incurable and the other party shall then have the right to terminate the License at any time by providing written notice of termination to the breaching party. In the event either party provides the other party with a notice of termination of the License, the License shall terminate on the date specified in the notice, and if no date is specified in the notice, the License shall terminate ten (10) days from the date of the notice.

      12.4    Effect of Termination. Upon the termination of the License for any particular region or for the entire Geographic Region:

      (i)    Licensee shall immediately cease making, using and selling Licensed Product and performing services using Licensed Product in the region(s) of the Geographic Region for which the License has terminated,

      (ii)    if the License has terminated for all regions of the Geographic Region, Licensee shall also immediately return all Confidential Materials to Licensee, and

      (iii)    Licensor shall not have any further obligation or liability under this Agreement with respect to such region(s) of the Geographic Region in which the License is terminated.

Notwithstanding any such termination of the License, nothing herein shall relieve Licensee of its obligations to pay Royalties or other payments that accrue prior to termination, or to fulfill its obligations under Sections 4, 5, 6, 7, 8, 9, 10, 11, 12 or elsewhere in this Agreement. Further notwithstanding any such termination of the License, Licensed Product on which all moneys due under this Agreement have already been paid to Licensor may be sold without further permission from Licensor, provided such sale occurs within six (6) months of termination.

## SECTION 13 - GENERAL PROVISIONS

      13.1    Purchase of Licensed Products by Licensor. At any time during the term of the License granted herein, Licensee shall enable Licensor and its employees to purchase reasonable quantities of Licensee's products from Licensee at Licensee's then-current lowest wholesale prices (e.g., at the highest-quantity price quoted to Customers, or at special promotional prices quoted to any Customer). In no event shall Licensor re-sell any of the products described in this Paragraph 13.1 at prices higher than paid by Licensor. Licensee shall provide catalogs and price lists for its products to Licensor as they become available to the general retail trade.

      13.2    Other Responsibilities. Licensee shall obtain any and all necessary licenses, approvals and other government authorizations necessary for the Licensed Products, including for their manufacture, sale, distribution, export, use, rental, lease and practice engaged in by Licensee and any of Licensee's Customers. Licensee shall ensure that the Licensed Products are safe and of good and workmanlike quality. Licensee and its Customers shall strictly comply with all applicable laws and regulations concerning Licensed Products, their manufacture, rental, lease, sale, shipment, export, etc., including but not limited to strict compliance with the Export Control Act of 1979.

      13.3    Attorneys' Fees. In the event of any arbitration or litigation between the Parties, the prevailing Party shall be entitled to recover from the non-prevailing Party any and all costs, including reasonable attorneys' fees, incurred by the prevailing Party. Such relief shall be in addition to any other relief, award or damages to which the prevailing Party may be entitled. The court or arbitrators shall determine the prevailing party for the purpose of this Paragraph.

      13.4    Injunctive Relief. Licensee and Licensor have determined that in the event of a breach or a threatened breach of this Agreement, the non-breaching party will suffer permanent and irreparable damage.



Accordingly, Licensee and Licensor agree that in the event of a breach or threatened breach of this Agreement by the other party, the non-breaching party shall be entitled to preliminary and permanent injunctive relief.

13.5 Severability. In case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provisions(s) had never been contained herein; provided that such invalid, illegal or unenforceable provisions shall first be curtailed, limited or eliminated to the extent necessary to remove such invalidity, illegality or unenforceability with respect to the applicable law as it shall then be applied.

13.6 Governing Law and Forum. This Agreement shall be governed, construed and enforced exclusively in accordance with the laws of the State of Utah and the laws of the United States of America. Any arbitration or litigation between the Parties shall be conducted exclusively in Salt Lake City, Utah, U.S.A. and the Parties hereby submit to such exclusive jurisdiction and venue, and agree that such jurisdiction and venue are proper.

13.7 Final Agreement. This Agreement constitutes the final and complete agreement between the Parties concerning the subject matter of this Agreement and supersedes all prior agreements, understandings, negotiations and discussions, written or oral (including prior drafts of this Agreement), between the Parties with respect thereto. No Party shall be bound by any condition, definition, representation, or warranty, other than as expressly set forth herein. Any modification, revision or amendment of this Agreement shall not be effective unless made in a writing executed by both of the Parties.

13.8 Time is of the Essence. Time is of the essence in the performance of all obligations under this Agreement.

13.9 Waiver. Any waiver of, or promise not to enforce, any right under this Agreement shall not be enforceable unless evidenced by a writing signed by the Party making such waiver or promise.

13.10 Headings. The headings in this Agreement are for the purpose of convenience only and shall not limit, enlarge or affect any of the covenants, terms, conditions or provisions of this Agreement.

13.11 Language. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

13.12 Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be sent by registered or certified mail, return receipt requested, or by commercial courier, with a required copy by facsimile transmission to the Parties at the addresses set forth above on page 1 of this Agreement, or to such other person and place as either Party shall designate by notice to the other Party. The party sending notice shall obtain confirmation that all facsimile transmissions were sent to the facsimile telephone number set forth above on page 1 of this Agreement or such other facsimile telephone number as either Party shall designate by notice to the other Party, or, in the event that facsimile transmission is impossible due to problems on the receiving end, that attempts were made.

13.13 Assignments. Licensor has specifically chosen Licensee to commercialize Gelastic and Gellycomb in the Field of Use because of Licensor's belief in Licensee's technical abilities, managerial efficiency, marketing expertise and high standards of business ethics. Accordingly, Licensee shall not, and Licensee has neither the right nor the power to, assign the License or this Agreement to any other person or entity without the advance written consent of Licensor. In the event that Licensee merges with any other

entity, changes its name, or otherwise transforms into a new entity, this Agreement shall be deemed binding upon and enforceable against such new or other entity. Licensor may, at its sole option, assign its rights or obligations hereunder, provided that any third party beneficiaries or third party delegatees agree in writing that each such assignment to which the third party beneficiaries or third party delegatees are parties is subject to the applicable terms and conditions of this Agreement.

13.14 Relationship. Neither Party is or shall be a partner, joint venturer, agent or representative of the other Party.

13.15 Insolvency and Receivership. If (i) Licensee becomes insolvent for any reason, (ii) a receiver is appointed for Licensee, (iii) Licensee files a petition for bankruptcy, or (iv) an involuntary petition for bankruptcy is filed for Licensee, then this Agreement shall be deemed executory and the License shall be deemed terminated. Licensor shall then be free to license the Technology Rights and the Trademark Rights to any other party on either an exclusive or nonexclusive basis, or to otherwise exploit the Technology Rights and the Trademark Rights, at Licensor's sole discretion.

13.16 Execution and Effective Date. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. The individuals signing below represent that they are duly authorized to do so by and on behalf of the Party for whom they are signing. When this Agreement has been executed by the duly authorized representatives of the Parties, it shall be effective as of the date of the last execution, and the Party performing such last execution shall insert the date of such last execution on the first page of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this License Agreement to be duly executed and entered into as of the date first above written.

LICENSEE: By (signature): [signature]

Name (print): Tim L. Brockman

Title: V.P. Brand Management

LICENSOR: By (signature): [signature]

Name (print): Terry V. Pearce

Title: L.C. Manager

 [initials] 12/9 TB 12/9